## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEW MEXICO

In re:   CAROL PLATT CAGAN,                                    No. 7-08-11193 JS

     Debtor.

OMER MAY,

     Plaintiff,

v.                                                            Adversary No. 09-1202 J

CAROL PLATT CAGAN,

     Defendant.

## <u>MEMORANDUM OPINION</u>

THIS MATTER is before the Court following a trial on the merits of this adversary proceeding to determine the dischargeability of certain debt under 11 U.S.C. § 523(a)(4) and 11 U.S.C. § 523(a)(6).   At issue is whether Defendant Carol Cagan's disposition of certain proceeds from the sale of certain real property in connection with the Lobo Land, LLC ("Lobo Land") bankruptcy case constitutes a willful and malicious injury within the meaning of 11 U.S.C. § 523(a)(6) or constitutes a breach of fiduciary duty, embezzlement or larceny sufficient to render the debt non-dischargeable under 11 U.S.C. § 523(a)(4).   The sale proceeds were designated under Lobo Land's confirmed plan to be disbursed to Plaintiff Omer May.   After consideration of the evidence in light of the applicable statutes and relevant case law, the Court finds that the debt at issue is non-dischargeable under 11 U.S.C. § 523(a)(6).   Because the Court finds that the debt is non-dischargeable under 11 U.S.C. § 523(a)(6) it is not necessary to consider whether the debt is non-dischargeable under 11 U.S.C. § 523(a)(4).

<u>FINDINGS OF FACT</u>

1.      Defendant Carol Cagan was the managing member and 97% owner of Lobo Land. Her partner, Dee Cross, owned the remaining 3%.   Ms. Cagan was in charge of the affairs of Lobo Land.

2.      Carol Cagan is a lawyer, and practiced in California in the field of entertainment law prior to moving to New Mexico.  Her area of expertise included the negotiation and drafting of contracts.

3.      Prior to the filing of Lobo Land's bankruptcy case, Plaintiff Omer May sold Lobo Land certain real property located in Angel Fire, New Mexico and made a non-recourse loan to the buyer to finance the purchase.  *See* Exhibit 11, Stipulated In Rem Judgment for Foreclosure of Mortgage Against the Bankruptcy Estate of Lobo Land Limited Liability Company, entered in the Eighth Judicial District Court, County of Colfax, State of New Mexico Case No. D-809-CV-200300181.

4.      Lobo Land filed a voluntary petition under Chapter 11 of the Bankruptcy Code on January 14, 2005 as Case No. 11-05-10262 SA.

5.      Mr. May is a creditor of Lobo Land.

6.      Among the assets of Lobo Land were three residential lots located in the Angel Fire Resort (the "residential lots"), including Lot 460 and Lot 782 (Lot 460 and Lot 782 hereafter are called, "Lots 460 and 782").

7.      Angel Fire Resort Operations asserted certain claims against Lobo Land representing unpaid membership dues and services.

8.      Lobo Land's plan of reorganization, as modified by Debtor's First Modification to Plan Dated October 11, 2005 ("First Modification"), was confirmed on March 8, 2006.  *See* Case

No. 11-05-10262 SA, Docket No. 75 (First Modification) and Docket No. 85 (Order Confirming Plan).

9.  The confirmed plan included the following provision:

> Debtor shall pay to May one or more lump sum payments totaling $40,000.00 from the proceeds of sales of the residential lots as such funds become unrestricted by order of the Court if such funds are not available prior to the Effective Date. Lobo Land shall promptly file such adversary proceedings as may be necessary to determine the validity of any adverse lien, claim or interest against the proceeds of the residential lost sales or against the residential lots in order to make such proceeds available to May.

> Plan, ¶ 6.3.1.3, *See* Case No. 11-05-10262 SA, Docket No. 73.

10.  The term "unrestricted" contained in the plan provision is a reference to the funds becoming free of a claim of lien of a person other than Mr. May.

11.  At the time Lobo Land sold Lots 460 and 782, the other residential lot remained unsold.

12.  Proceeds from the sales of Lots 460 and 782 were placed in escrow at C.U. Title, Inc. pending an order from the Court to release the funds.

13.  On July 9, 2007 an Order to Release Monies in Escrow ("Release Order") was entered in the Lobo Land Bankruptcy Case. *See* Case No. 11-05-10262, Docket No. 116.

14.  The Release Order was approved by counsel for Lobo Land and counsel for Angel Fire Resort Operations and directed that "[a]ll monies held in escrow by CU Title shall be released immediately and payable to Lobo Land, LLC." *Id.*

15.  Counsel for Mr. May did not approve the Release Order and did not receive notice of the entry of the Release Order.

16.     As a result of the Release Order, funds in the amount of $32,369.96 were released from the escrow account at C.U. Title, Inc., consisting of $13,559.21 from the sale of Lot 460 and $18, 810.75 from the sale of Lot 782.

17.     Some time before the entry of the Release Order, Ms. Cagan had been diagnosed with cancer.

18.     At the time that the escrowed funds were released, Ms. Cagan was headed to California to undergo cancer surgery.

19.     Ms. Cagan had a bank account at the same bank that C.U. Title, Inc. had an account.  Lobo Land did not have an account at that bank.

20.     To facilitate the release of the escrowed funds before Ms. Cagan returned from California , Ms. Cagan directed C.U. Title, Inc. to deposit the monies released from escrow into her personal account at International Bank in Raton.

21.     Depositing the funds into Ms. Cagan's personal bank account is contrary to the terms of the Release Order, which directed C.U. Title, Inc. to release the funds to Lobo Land.

22.      Ms. Cagan did not transfer the funds released from escrow to Lobo Land or disburse the funds to Mr. May.

23.      Ms. Cagan spent the funds in question that were deposited in her personal account.

24.     Mr. May filed an adversary proceeding against Lobo Land and Carol Cagan in connection with the Lobo Land bankruptcy case seeking, among other things, judgment against Lobo Land and Carol Cagan jointly and severally in the amount of $32,369.96, plus attorneys fees and costs based on claims for conversion and breach of fiduciary duty.

-4-

*See* Adversary Proceeding No. 07-1125S, Complaint for Conversion, Breach of Fiduciary Duty, and Prejudgment Attachment ("Lobo Land Complaint"), Docket No. 1.   The Lobo Land Complaint included a claim for punitive damages. *Id.*

25.     The Lobo Land bankruptcy case converted to Chapter  7 on January 3, 2008.  *See* Case No. 7-05-10262, Docket No. 144.   Ms. Cagan did not attend the hearing on conversion of the Lobo Land bankruptcy case.

26.     Following a trial on the merits, Mr. May obtained a judgment against Lobo Land in Adversary No. 11-1125S based on Lobo Land's breach of its contractual obligations under the confirmed plan.  *See* Findings of Fact and Conclusions of Law after Trial on the Merits ("Lobo Land FFCL"), Adversary No. 11-1125 S, p. 8, ¶ 3 - Docket No. 32. The judgment included punitive damages in the amount of $16,000.00.  *Id.*  at p.13.

27.     Carol Cagan did not participate in the trial, and the judgment did not asses any liability as to Ms. Cagan.  *See* Lobo Land FFCL, Adversary No. 11-1125 S, Docket No. 33, Judgment entered against Lobo Land only.

28.     Carol Cagan filed a voluntary petition under Chapter 13 of the Bankruptcy Code on April 18, 2008 as Case No. 13-08-11193 .   Her case converted to Chapter 7 on August 26, 2009.  *See* Case No. 7-08-11193JS, Docket No. 107.

29.     Mr. May filed this adversary proceeding on December 7, 2009.

CONCULSIONS OF LAW

A.  <u>Whether the debt is non-dischargeable under 11 U.S.C. § 523(a)(6)</u>

Pursuant to 11 U.S.C. § 523(a)(6), debts resulting from the "willful and malicious injury by the debtor to another entity or to property of another entity" are not dischargeable.  11 U.S.C. § 523(a)(6).  The "willful" element under this section requires both a willful act and an intended

harm; an intentional act that leads to an injury is not sufficient.[1]  Whether the debtor had the

requisite intent to harm is evaluated under a subjective standard that focuses on the debtor's state

of mind; the debtor must have desired the consequences of his or her act or have intentionally

acted believing that the consequences of the act were substantially certain to result from it.[2]

Evidence of the debtor's state of mind may be inferred from the circumstances.[3]  An intentional

breach of contract, without more, is insufficient to sustain a non-dischargeable claim under 11

U.S.C. § 523(a)(6).[4]  The "malicious" component of 11 U.S.C. § 523(a)(6) requires a showing of

---

[1] *See Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 977, 140 L.Ed.2d 90  (1998)(holding that "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury.")(emphasis in original).  "[D]ebts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." *Id.* at  64, 118 S.Ct. at 978.

[2] *Mitsubishi Motors Credit of America, Inc. v. Longley (In re Longley)*, 235 B.R. 651, 657 (10th Cir. BAP 1999) (focusing on the debtor's subjective intent and stating that "[w]illful injury may be established by direct evidence of specific intent to harm a creditor or the creditor's property" (citing *CIT Fin. Services, Inc. v. Posta (In re Posta)*, 866 F.2d 364, 367 (10th Cir. 1989)) . . . . [and] . . .  may also be established indirectly by evidence of both the debtor's knowledge of the creditor's lien rights and the debtor's knowledge that the conduct will cause particularized injury." (citing *Dorr, Bentley & Pecha, CPAs P.C. v. Pasek (In re Pasek),* 983 F.2d at 1524, 1527 (10th Cir. 1993)).  *Accord In re Patch*, 526 F.3d 1176, 1180 (8th Cir. 2008)(stating that "the 'willful' element is a subjective one . . . "); *In re Su*, 290 F.3d 1140, 1146 (9th Cir. 2002)(stating that "[t]he subjective standard correctly focuses on the debtor's state of mind and precludes application of § 523(a)(6)'s nondischargeability provision short of the debtor's actual knowledge that harm to the creditor was substantially certain."); *In re Kennedy*, 249 F.3d 576, 580 (6th Cir. 2001). *But see In re Williams*, 337 F.3d 504, 509 (5th Cir. 2003)("The test for willful and malicious injury under Section 523(a)(6), thus, is condensed into a single inquiry of whether there exists 'either an objective substantial certainty of harm or a subjective motive to cause harm' on the part of the debtor.")(quoting *Miller v. J.D. Abrams, Inc. (In re Miller),* 156 F.3d 598, 606 (5th Cir. 1998)).

[3] *See Nat'l Labor Relations Board v. Gordon (In re Gordon)*, 303 B.R. 645, 656 n.2 (Bankr.D.Colo. 2003)(noting that "[w]hen the Court is presented with proof of intentional act by a debtor and proof that the act perpetrated by the debtor was certain to cause injury, the Court believes that it is absolutely permissible to infer the ultimate fact of actual intent to cause injury from those evidentiary facts.")(citations omitted).

[4] *See, e.g., Palazzolo v. Colclazier (In re Colclazier),* 134 B.R. 29, 33 (Bankr.W.D.Okla. 1991)(stating that "523(a)(6) exempts from discharge only damages from tortious breaches of contract"  and declining to broaden the reach of § 523(a)(6) to intentional breaches of contract); *In re Phillips*, 2007 WL  2083610, *4 (Bankr.D.Kan. July 17, 2007)(cautioning that "'[c]ourts  must be careful not to equate a breach of a contract, which happens to be a security agreement, with conduct causing willful and malicious injury.")(quoting 4 Collier on Bankruptcy ¶ 523.12[3] (Alan N. Resnick and Henry J. Sommer, eds.-in-chief, 15th ed. rev. 2006)).  *See also, In re Jercich*, 238 F.3d 1202, 1205 (9th Cir. 2001)(stating that "although § 523(a)(6) *generally* applies to torts rather than to contracts and an intentional breach of contract *generally* will not give rise to a nondischargeable debt, where an intentional breach of contract is accompanied by tortious conduct which results in willful and malicious injury, the resulting debt is excepted from discharge under § 523(a)(6).")(emphasis in original)(citations omitted).

the following:  "1) the act is wrongful; 2) the act is intentional; and 3) the act is without just cause or excuse"[5]

Conversion of a creditor's property interest can support a non-dischargeability claim under 11 U.S.C. § 523(a)(6).[6]  As explained by the Supreme Court in *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934), decided under subsection (6) of § 17(a) of the Bankruptcy Act of 1898, the precursor to 11 U.S.C. § 523(a)(6),

> There is no doubt that an act of conversion, if willful and malicious, is an injury to property within the scope of this exception . . . . But a willful and malicious injury does not follow as a matter of course from every act of conversion, without reference to the circumstances.  There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice.

293 U.S. at 332 (citations omitted).

Defendant raises two main arguments in defense of Mr. May's claim:  1) that the funds released pursuant to the Release Order did not constitute Mr. May's property; and 2) that there is no evidence of any wrongful intent on the part of Ms. Cagan.  The Court will address each argument in turn.

Whether Mr. May held an interest in the proceeds of sale of Lots 460 and 782 is a necessary pre-requisite to his establishing his claim against Ms. Cagan is nondischargeable under 11 U.S.C §523(a)(6), which requires willful and malicious injury "to another entity *or to*

---

[5] *See Jercich,* 238 F.3d at 1209 (stating that "[a] malicious injury involves '(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse.'")(quoting *In re Bammer,* 131 F.3d 788, 791 (9th Cir. 1997)(en banc)(quotations omitted); *Bombardier Capital, Inc. v. Tinkler ( In re Tinkler),* 311 B.R. 869, 880 (Bankr.D.Colo. 2004)(relying on the malice test articulated in *Tinker v. Colwell,* 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904) and reasoning further that because the willfulness requirement under *Geiger* requires and act that is both wrongful and intentional, "the malice prong of § 523(a)(6) is satisfied upon a showing that the injury was inflicted *without just cause or excuse.*")(emphasis in original)(citations omitted).

[6] *Longley,* 235 B.R. at 657 (acknowledging that "conversion can, under certain circumstances, give rise to a non-dischargeable debt pursuant to § 523(a)(6)."); *Bank of Utah v. Auto Outlet, Inc. (In re Auto Outlet, Inc.),* 71 B.R. 674, 676 (Bankr.D.Utah 1987)("Although this section does not specifically mention conversion, 'willful and malicious injury' was intended to include 'willful and malicious conversion.'")(citing 124 Cong.Rec.H.11096 (daily ed. Sept. 28, 1978); S. 17412 (daily ed. Oct. 6, 1978) (statement of Rep. Edwards and Sen. DeConcini)); *Borg-Warner Acceptance Corp. v. Shah (In re Shah),* 96 B.R. 290, 293 (Bankr.D.C.Cal. 1989)("The tort of conversion is one type of wrongful behavior that may be nondischargeable under Section 523(a)(6).")(citations omitted).

*property of another entity"*(emphasis added). It is also required for Mr. May to establish conversion.[7] The tort of conversion under New Mexico law generally requires "the unlawful exercise of dominion and control over personal property belonging to another in exclusion or defiance of the owner's rights, or acts constituting an unauthorized and injurious use of another's property, or a wrongful detention after demand has been made."[8]

Often claims by a lender under 11 U.S.C. § 523(a)(6) based on conversion are premised upon the debtor's sale of collateral subject to the lender's security interest.[9] Here, Mr. May had no security interest. Instead, Mr. May relies on the language of Lobo Land's confirmed plan to establish his property interest in the funds at issue. The plan provides:

> Debtor shall pay to May one or more lump sum payments totaling $40,000.00 from the proceeds of sales of the residential lots as such funds become unrestricted by order of the Court if such funds are not available prior to the Effective Date. Lobo Land shall promptly file such adversary proceedings as may be necessary to determine the validity of any adverse lien, claim or interest against the proceeds of the residential lost sales or against the residential lots in order to make such proceeds available to May.

This language earmarks specific sale proceeds to be paid to Mr. May "as such funds become unrestricted" by Court order. Upon confirmation of Lobo Land's plan, such language created an inchoate or future interest held by Mr. May in the proceeds from the sales of the residential lots.[10] When Lots 460 and 782 sold, the sale proceeds were deposited in escrow pending entry of an order directing their distribution. Upon the entry of the Release Order, the funds "became

---

[7] *See Shah,* 96 B.R. at 293 (stating that "[t]he threshold issue for Plaintiff is whether it had any personal property over which Defendants asserted wrongful dominion.").

[8] *Nosker v. Trinity Land Co.,* 107 N.M. 333, 337-338, 757 P.2d 803, 807-808 (Ct.App. 1988)(citations omitted). *See also Billsie v. Brooksbank,* 525 F.Supp.2d 1290, 1296 (D.N.M. 2007)(discussing the forms of the tort of conversion recognized in New Mexico).

[9] *See, e.g., Tinkler,* 311 B.R. 869 (conversion claim under § 523(a)(6) based on sale of inventory subject to floor plan financier's security interest); *America First Credit Union v. Gagle (In re Gagle),* 230 B.R. 174 (Bankr.D.Utah 1999)(conversion claim under § 523(a)(6) based on sale of truck parts in violation of creditor's security interest in truck); *Commercial Bank & Trust Co. of Tulsa v. Noland (In re Noland),* 100 B.R. 68 (Bankr.D.Kan. 1989)(conversion claim under § 523(a)(6) based on debtor's stripping of fixtures in home subject to debtor's security interest represented by mortgage on the property).

[10] A future interest is "[a] property interest in which the privilege of possession or of other enjoyment is future and not present." Black's Law Dictionary 685 (7th ed. 1999). An inchoate interest is "[a] property interest that has not yet vested." Black's Law Dictionary 816 (7th ed. 1999).

-8-

unrestricted," and Mr. May held a vested, present interest in such escrowed funds.[11] Because Mr. May's property interest consists of an immediate right to payment from specific, identified funds held in escrow, the Court finds that such an interest is sufficient for purposes of 11 U.S.C. § 523(a)(6).[12] Such interest also satisfies the requirement of a property interest to establish conversion under New Mexico law. The fact that the initial loan between Lobo Land and Mr. May was non-recourse does not alter this result. Mr. May's property interest is based on the provision in the confirmed plan which obligated Lobo Land to pay him from the proceeds of the sale of the residential lots "as such funds became unrestricted," and the deposit of these funds in escrow to be disbursed pursuant to such provision and a court order.

The surrounding facts and circumstances also support a finding that Ms. Cagan's actions were both willful and malicious. At trial, Ms. Cagan testified that she believed the language in Lobo Land's confirmed plan obligated Lobo Land to remit $40,000 to Mr. May, but that Lobo Land could wait to pay the funds until all three residential lots were sold. She acknowledged that although she originally deposited the sale proceeds in her personal account for safekeeping until she returned from California, she failed to transfer any of the funds to a Lobo Land account after she returned from California and she did not arrange to disburse the funds to Mr. May.

---

[11] A vested interest is "[a]n interest the right to enjoyment of which, either present or future, is not subject to the happening of a condition precedent" Black's Law Dictionary 816 (7th ed. 1999). A present interest is "[a] property interest in which the privilege of possession or enjoyment is present and not merely future; an interest entitling the holder to immediate possession." *Id.*

[12] *Cf. Cheek v. Lowe's of Georgia, Inc. (In re Cheek),* 17 B.R. 875, 878-79(Bankr.Ga. 1982)(finding that injury to an inchoate lien was a sufficient injury to creditor's property interest); 3 Collier on Bankruptcy,¶ 523.12[2] at 523-94 (15th ed. rev'd 2009)("Injuries covered by the section 523(a)(6) discharge exception are not confined to physical damage or destruction; an injury to intangible personal or property rights is sufficient."). *See also McCain Foods USA, Inc. v. Shore (In re Shore),* 317 B.R. 536, 544 (10th Cir. BAP 2004) (rejecting debtor's argument that creditor did not have a property interest, finding that creditor held a judgment which established a right to payment, and distinguishing the case from *In re Saylor,* 178 B.R. 209, 215 (9th Cir. BAP 1995), *aff'd,* 108 F.3d 219 (9th Cir. 1997), in which the Ninth Circuit Bankruptcy Appellate Panel stated that "[a]bsent either a right to payment or a damaged property interest, there is no debt which could be non-dischargeable . . .")); *Tinkler,* 311 B.R. at 875 ("'An action for damages for the conversion of personal property cannot be maintained unless plaintiff had a general or special property[interest] in the personalty converted, coupled with possession *or the immediate right thereto.*'")(emphasis added)(quoting *Byron v. York Inv. Co.* 133 Colo. 418, 296 P.2d 742, 745 (1956)(citing *Dorris v. San Luis Valley Fin. Co.,* 90 Colo. 209, 7 P.2d 407, 408 (1932)(remaining citations omitted).

Conflicting testimony was offered by Dee Cross and Ms. Cagan regarding Ms. Cagan's expenditure of the sale proceeds. Mr. Cross testified that he believed at least a portion of the funds was used to pay for expenses of Lobo Land. This testimony conflicted with his earlier testimony at a deposition where he testified the money was spent to defray Ms. Cagan's medical expenses and associated travel expenses. At trial Ms. Cagan acknowledged that she had no specific memory of her expenditure of the funds. She testified both that the funds were spent on her living expenses and that she used some of the funds to pay expenses of Lobo Land. Ultimately she could only acknowledge that the money was spent.

Ms. Cagan acknowledged that she read the language of the plan requiring the funds to be paid to Mr. May in one or more lump sum payments from the sale of the residential lots as the funds became unrestricted by court order. Given that Ms. Cagan is an attorney experienced in contract law, the Court finds her testimony that she believed that language did not obligate Lobo Land to pay Mr. May as the funds became unrestricted, but allowed Lobo Land to wait to pay Mr. May until all three residential lots were sold, not credible. The language in the confirmed plan is clear. It is not reasonably susceptible to the interpretation Ms. Cagan asserts she made. The Court finds that Ms. Cagan knew that Lobo Land was required to pay Mr. May from the proceeds of the sale of the residential lots as such funds became unrestricted even if a payment was in an amount less than $40,000, which occurred upon entry of the Release Order. She did not do that. Her actions were willful because she directed that the funds be deposited into her personal account and then spent them. She may have placed them there for convenience and safekeeping, but upon her return she did nothing to ensure that Lobo Land's obligation to pay the proceeds to Mr. May was fulfilled. Ms. Cagan used the funds instead of paying them to Mr. May contrary to the clear language of the confirmed plan. Ms. Cagan's actions demonstrate she acted

-10-

with willful intent to injure within the meaning of 11 U.S.C. §523(a)(6); she intended to deprive Mr. May of his right to receive the sale proceeds as they became unrestricted, and, therefore, to injure his property interest. Further, Ms. Cagan's actions demonstrate she actions were malicious within the meaning of 11 U.S.C. §523(a)(6); she acted with willful intent to injure without just cause or excuse. This evidence also establishes conversion under New Mexico law.

Ms. Cagan argues that because the contractual obligation runs to Lobo Land, Mr. May's remedy must be pursued against Lobo Land, which he has already done through the Lobo Land Adversary Proceeding. This Court disagrees. Ms. Cagan is the principal and majority owner of Lobo Land and the person who acted on its behalf in converting the proceeds from the sale of the residential lots to her own use; her active participation in the conversion renders the debt nondischargeable in her personal bankruptcy case.[13]

B. Whether Mr. May is entitled to punitive damages.

Mr. May asserts that he is entitled to punitive damages based on Ms. Cagan obtaining the Release Order without giving notice to Mr. May and without disclosing to the Bankruptcy Court that the proceeds from the sale of the residential lots to be released from escrow under the Release order were committed under Lobo Land's confirmed plan to be disbursed to Mr. May. There is no evidence before the Court regarding Ms. Cagan's involvement in the

---

[13] *Cf. Mercantile Bank of Arkansas, N.A. v. Speers (In re Speers),* 244 B.R. 142 (Bankr.E.D.Ark. 2000)(debt based on corporation's sale of creditor's collateral and failure to remit proceeds to creditor in violation of creditor's security interest was non-dischargeable under § 523(a)(6) as to debtor who was the president and sole shareholder of corporation and who actively participated in the conversion); *Ford Motor Credit Co. v. Owens,* 807 F.2d 1556, 1559 (11th Cir. 1987)(affirming district court's determination that debt was nondischargeable in corporate president's personal bankruptcy case noting that "a personal debtor who, as an officer of a corporation, actively participates in the conversion of property which is subject to the security interest of a third party, is personally liable to said third party and thus the debt is nondischargeable pursuant to section 523(a)(6).")(citations omitted); *In re Armstrong,* 2006 WL 2850527 *13 (Bankr.D.Idaho October 3, 2006)(stating that "[i]f personal involvement on the part of an officer is shown, and the officer's conduct is shown to involve a willful and malicious injury, then the resulting personal debt of the officer is nondischargeable under § 523(a)(6).")(citation omitted).

issuance of the Release Order.  The motion seeking entry of the Release Order and the

Release Order were approved by Lobo Land's counsel, not by Ms. Cagan.

Whether an award of punitive damages is appropriate falls within the Court's

discretion.[14]  Mr. May cites no section of the Bankruptcy Code that would entitle him to an

award of punitive damages.  Furthermore, no evidence was presented to indicate that Ms.

Cagan acted with a culpable mental state in obtaining the Release Order, or that her actions

were so outrageous that they warrant an award of punitive damages.[15] The Court, therefore,

will deny Mr. May's request for punitive damages.

CONCLUSION

Based on the foregoing, the Court concludes that the debt at issue is non-dischargeable

under 11 U.S.C. § 523(a)(6).  No cause exists to impose punitive damages.  This

memorandum constitutes the Court's findings of fact and conclusions of law in accordance

with Fed.R.Bankr.P. 7052.  The Court will enter a judgment consistent with this

Memorandum Opinion.

ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket:  September 28, 2010.

---

[14] *See In re Scroggin*, 364 B.R. 772, 781 (10th Cir. BAP 2007)(reviewing bankruptcy court's award of punitive damages based on willful stay violation under abuse of discretion standard).

[15] *Cf. Sloan v. State Farm Mut. Auto. Ins. Co.,* 360 F.3d 1220, 1232 (10th Cir. 2004)(citing *McGinnis v. Honeywell, Inc.,* 110 N.M. 1, 9, 791 P.2d 452 , 460 (1990)(reviewing standard for awarding punitive damages in insurance-bad-faith cases and stating that, "[b]ecause punitive damages are imposed for the limited purposes of punishment and deterrence, a culpable mental state is a prerequisite to punitive damages.").  *See also, Diviney v. Nationsbank of Texas, N.A. (In re Diviney),* 225 B.R. 762, 776 (10th Cir. BAP 1998)(considering an award of punitive damages in connection with willful stay violation, and acknowledging that under one standard, a party "may recover punitive damages when the defendant acted with actual knowledge that he was violating a federally protected right or with reckless disregard of whether he was doing so.")(citing *Fry v. Today's Homes, Inc. (In re Fry),* 122 B.R. 427, 431 (Bankr.N.D.Okla. 1990)(citing *In  re Wagner,* 74 B.R. 898 (Bankr.E.D.Pa. 1987)).

-12-

COPY TO:

Jay Hertz                            Chris Pierce
Attorney for Plaintiff            Attorney for Defendant
PO Box 1945                 PO Box 30088
Albuquerque, NM  87103      Albuquerque, NM  87190